| | | |
|---|---|---|
| ELISE BOURQUE | * | CIVIL ACTION NO. 08-0567 |
| VERSUS | * | JUDGE MELANCON |
| MICHAEL J. ASTRUE, COMM. OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability. Therefore, it is recommended that the Commissioner's decision be **REVERSED**.

### *Background and Procedural History*

Elise Bourque, born November 11, 1965, filed an application for supplemental security income on June 27, 2005, alleging disability beginning May 24, 2005, due to asthma and psychological disorders. The claim was denied initially on January 19, 2006. A request for a hearing before an Administrative Law Judge ("ALJ") was timely filed, and a hearing was held on May 8, 2007, in Lafayette, Louisiana. (Tr. 246-272). Claimant, represented by attorney William Ziegler, appeared and testified. Lionel J. Bordelon, an impartial vocational expert ("VE"), also testified at the hearing.

On August 30, 2007, an unfavorable decision was issued by the ALJ. (Tr. 16-24). An appeal was taken by claimant to the Appeals Council on September 17, 2007, which denied review on April 4, 2008. (Tr. 10, 4). After that denial, the ALJ's decision became the final decision of the Commissioner. Claimant then filed the instant suit pursuant to 42 U.S.C. § 405(g).

### Standard of Review

The court's review is restricted under 42 U.S.C. § 405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with the relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 136 (5th Cir. 2000); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying the improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir.1986).[1] While substantial evidence lies somewhere between a scintilla and a preponderance, substantial evidence clearly requires "such relevant

---

[1] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Carey*, 230 F.3d at 136; *Anthony*, 954 F.2d at 292; *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991). The court may not re-weigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. *Carey*, 230 F.3d at 136; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson*, 864 F.2d at 343.

evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir.1991).

### *Analysis of Impairments*

To be entitled to benefits under the Social Security Act, claimant must prove that she is disabled according to the specifications of the Act. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a); *Anthony v. Sullivan*, 954 F.2d at 292.

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1992).[2] When a mental disability claim is made, such as affective and depressive disorders and bipolar syndrome here, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure

---

[2] The procedure is as follows:
1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of medical findings.
2. A person who does not have a "severe impairment" will not be found to be disabled.
3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
4. If a person can still perform his past work, he is not disabled.
5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

substitutes specialized rules at step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e) provides that the ALJ must document his application of this technique to the claimant's mental impairments.

*Satterwhite v. Barnhart,* 44 Fed. Appx. 652 (5th Cir. 2002) (unpublished).[3]

At step one, the ALJ determined that claimant had not engaged in substantial gainful activity since June 27, 2005, the application date. (Tr. 18). At step two, the ALJ determined that claimant had the following severe impairments: asthma, schizoaffective disorder, and a personality disorder. At step three, the ALJ found that claimant's combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, Appendix 1. (Tr. 19). Although claimant's attorney argued that the claimant's condition met Listing 12.04 (Affective Disorders) and possibly 12.05 (Mental Retardation), the ALJ found that the medical evidence supported the conclusion that her condition met neither of those listings, nor Listing 12.03 (Schizophrenic, Paranoid, or Other Psychotic Disorders) nor 12.08 (Personality Disorders). In making this finding, the ALJ considered whether the "paragraph B"

---

[3] For a succinct summary of the current law, see *Serrano-Diaz v. Barnhart,* 2004 WL 2431693, *6 (E.D.Pa. 2004).

criteria for mental impairments were satisfied.[4] Because he found that claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the ALJ found that the "paragraph B" criteria were not satisfied. (Tr. 20).

The ALJ found that claimant had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, one-to-two step job instructions with limited interaction with the public. (Tr. 20). Claimant must also work in an environment with no excessive exposure to pulmonary irritants.

At step four, the ALJ found that claimant had no past relevant work. (Tr. 22). At step 5, based on VE testimony, the ALJ found that considering claimant's age, educational background, work experience, and RFC for a wide range of all levels of work, claimant could perform other work that exists in significant numbers in the national economy such as a fast food worker, an assembler, and a handpacker. Thus, the ALJ found claimant not disabled. (Tr. 23).

---

[4] Subpart B (of Listings 12.03, 12.04, and 12.08) requires at least **two** of the following:
(1) marked restriction of activities of daily living; or
(2) marked difficulties in maintaining social functioning; or
(3) deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner; or
(4) repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms.
20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.03, 12.04, 12.08.

*Assignment of Errors*

Claimant alleges the following error:[5]

I.    The ALJ erred in his assessment of claimant's residual functional capacity,

resulting in a failure to sustain his burden at step 5, erroneously relying upon the

testimony of the vocational expert which was given in response to a defective

hypothetical question.

*Administrative Record*

**I.    Medical Evidence**

**A.  Report from Dr. Howard Alleman dated 2004.**  Dr. Alleman diagnosed

claimant with asthma and prescribed medication for same.  (Tr. 103).

**B.  Records from Abram Kaplan Memorial Hospital dated June 6, 2004 to

April 21, 2005**.  On June 6, 2004, claimant presented at the Emergency Room ("ER")

after having been involved in a motor vehicle accident. (Tr. 129).  She reported a

headache as well as neck and back pain.  A Radiology report indicated CT scans of the

brain, cervical and lumbar spine were all normal.  (Tr. 150).

**C.  Letter from Maria Hebert, M.S.W., dated July 26, 2005.**  Ms. Hebert

indicated that claimant was admitted to the Crowley Mental Health Center ("CMHC") on

June 24, 2005.[6]  (Tr. 151).  Her symptoms included: depressed mood, frequent crying

---

[5] *See* claimant's brief.  [rec. doc. 9, p. 2].

[6] It is unclear from the record whether claimant was admitted as an in-patient at CMHC.

6

spells, sleep disturbance, appetite disturbance, mood swings, and feelings of helplessness, hopelessness, and worthlessness. Dr. John Dauphin noted a diagnosis of Bipolar Disorder (296.89), Post Traumatic Stress Disorder (309.81), and Mild Mental Retardation (317.00). Her medications included: Risperdol (1mg/twice a day), Trazadone (100-200mg at bedtime), and Vistaril (50mg/three times a day) as needed for anxiety. It was Ms. Hebert's opinion that claimant could not maintain a job.

**D. Records from CMHC from June 24, 2005 to November, 30, 2005.** Claimant was referred to CMHC by Tyler Mental Health in June of 2005. (Tr. 210). She reported that she had just moved from California, where she was seeing a psychiatrist, to Kaplan, Louisiana. She admitted to feeling suicidal about one month prior when her then-boyfriend threw her out of the house.

Claimant stated that she was diagnosed with Bipolar Disorder in California and was currently out of her medication. Her symptoms were depressed mood, frequent crying spells, sleep and appetite disturbance, and mood swings. Claimant stated that she had worked at several jobs but was usually fired quickly because she "does not get along with the public." (Tr. 213). Claimant's intellectual functioning seemed below average, and her insight was questionable. (Tr. 214). Claimant's assets were her willingness to seek and obtain help. Her liabilities were her current mental health and limited social support. Her diagnosis was bipolar disorder, mood disorder NOS, post-traumatic stress disorder, and mild mental retardation. (Tr. 220). The recommendation included

7

medication management and individual counseling. Her medications were Risperdol, Vistaril, and Trazadone. (Tr. 207).

Claimant was seen again on July 7, 2005, and she reported that she was feeling better and "doing okay." (Tr. 204-5). She was still experiencing mood swings and was quick to anger. Anger management was recommended. On July 22, 2005, claimant was very quiet and seemed depressed. (Tr. 204). She reported mood swings and headaches, and she said that she had been sleeping a lot. Claimant attended an anger management class on August 9, 2005. (Tr. 203). On August 19, 2005, claimant was feeling much calmer. Her medications were continued.

On October 30, 2005, claimant telephoned CMHC to report that she had been seeing Dr. Conception in Abbeville. (Tr. 202). She stated that she had run out of her Effexor and Xanax, which she indicated were very helpful to her. She reported feeling edgy and irritable. Claimant was told to call Dr. Conception's office or to go to his clinic to explain her current problem, or to go to an emergency room in the event of a crisis.

**E. Consultative Report by Dr. Alfred Buxton dated November 21-22, 2005.**

Dr. Buxton, a clinical psychologist, consultatively evaluated claimant at the request of DDS. (Tr. 152). She reported an 8th grade education with poor grades. She indicated that she quit school at age 16 and had no other formal academic or vocational training. She had last worked "a few years ago" at a fast food restaurant but was "let go." She stated that she had been going to Crowley Mental Health on a monthly basis for approximately

five months. (Tr. 153). She also stated that she had been seeing a local psychiatrist, Dr. Conception, for her anxiety and panic attacks. Claimant noted that her appetite and sleep were good with her medication, but that her energy was poor. Dr. Buxton observed that she seemed a bit groggy, and he opined that she seemed to be a bit over-sedated. (Tr. 154).

On examination, claimant was alert and responsive, she possessed good verbal skills, and her concentration was good. Her reasoning was fair but insight was poor. Recent and remote memories were intact. Her slow rate of performance seemed secondary to her medication effect. Intellect was subaverage, and judgment was good. Her GAF score was 60 at that time and was 55 in the preceding five months. She reported that she heard "people telling her to do things" and also reported chronic low level general paranoia.

Dr. Buxton diagnosed a schizoaffective disorder with a moderate degree of impairment and a personality disorder with mixed features (DSM-IV, 301.90). While Dr. Buxton found claimant bright enough to understand simple instructions, he opined that she would have difficulty responding in a reliable and dependable fashion as an employee secondary to the negative impact of the schizoaffective disorder and the characterological defects on her functional capabilities. She would likely not respond well to the frustration and stress that she would encounter in the job setting and would perform in a fashion that would lead to her own demise. This was apparently what happened with claimant's

previous attempts at employment.  While she may be able to establish relationships, she would have some difficulty maintaining mutually rewarding relationships with co-workers and supervisors.  In closing, Dr. Buxton stated that "[i]f, and when, she should demonstrate significant improvement in her overall functional status, . . . then an attempt at gainful competitive employment would be appropriate."

**F.  Psychological Evaluation by Dr. Sandra B. Durdin dated December 21, 2005**.  Dr. Durdin, a clinical psychologist, consultatively evaluated claimant for a mental health assessment.  (Tr. 158).  It was noted that claimant malingered on the testing.  She reported attendance in school through the 8th grade with all "F's."  She said that she lived with her sister, never married, and had two children aged 18 and 19 years.  She reported that she used to go to Crowley Mental Health but that she quit going because "they did not help her."  (Tr. 159).  She said that she hears voices.  She indicated that she used to drive but does not anymore.

Dr. Durdin indicated that claimant was rude and irritated because she came to the office at the wrong time and had to wait.  Her cognitive assessment was completely invalid because she refused to cooperate, and her entire presentation was one of anger. Her estimated level of intellectual functioning was considered to be borderline at minimum.  She scored zeros on all subtests.  Her ability to understand, remember, and carry out simple instructions was considered adequate.

_____

**G. Psychiatric Review Technique Form dated January 13, 2006.** Consultant's notes indicate that claimant presented at the district office as lethargic and slow. (Tr. 175). She was wearing Disney character Goofy slippers. Notes further indicate that there was insufficient evidence for a finding of disability due to claimant's failure to cooperate at the consultative examination.

**H. Physical Residual Functional Capacity Assessment dated January 18, 2006.** No exertional, postural, manipulative, visual, or communicative limitations were noted. (Tr. 179-181). Claimant should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. due to her asthma. (Tr. 182-3).

**I. Records from Abbeville Community Health Center from October, 2005 to February, 2007.**[7] Claimant presented on October 6, 2005, with anxiety and depression. (Tr. 189). She was diagnosed with major depression and anxiety disorder and was prescribed medication, including Xanax. (Tr. 190). In December, 2005, claimant was compliant with medications and reported feeling good and sleeping well. (Tr. 187). In February, 2006, claimant reported that she stopped taking one of her medications because of an adverse skin reaction, and so she was not sleeping well. Risperdol and Klonopin were prescribed. (Tr. 190). In March, 2006, claimant reported less nervousness and anxiety. She denied feeling depressed and had no side effects from her medication. In May, 2006, claimant stated that she ran out of her Risperdol and had "bad nerves" as a

---

[7] Portions of these records are illegible.

result. (Tr. 186). She reported trouble sleeping at times and also reported continued hallucinations.

In July of 2006, she was nervous, depressed at times, and reported more auditory hallucinations. (Tr. 195). She was having financial troubles. Her dosages of Risperdol and Klonopin were increased. Claimant missed several appointments before returning to the health center on November 13, 2006. (Tr. 194). Claimant was informed that she would be discharged from treatment if she missed another appointment. She indicated that she had difficulty getting a ride and had no phone. She denied feeling depressed and had no hallucinations. She reported frequent headaches when taking Risperdol.

Claimant was not seen again until February 26, 2007. (Tr. 193). She was more anxious and denied any hallucinations or depression. Compliance with medications and follow up was discussed. Claimant agreed with the recommendations, and her medications were continued.

**J. Psychological Evaluation by Dr. F.T. Friedberg dated May 1, 2007**. Dr. Friedberg, a clinical psychologist, evaluated claimant at the request of her attorney. (Tr. 199). Claimant was almost in a vegetative state. Her response times were very slow, and she appeared to exhibit thought blocking and mild to moderate mental retardation. He found claimant to be "extremely fragile." (Tr. 200). Dr. Friedberg also met with claimant's daughter, who stated that her mother does not cook, and also that her children are often fearful of leaving her alone because she becomes confused easily.

A review of her medical history was found by Dr. Friedberg to be consistent with a major emotional disorder, and her medications were consistent with that diagnosis.[8] Dr. Friedberg further indicated that her vocational and behavioral history and her work production was consistent with a diagnosis of mild mental retardation. (Tr. 200). It was Dr. Friedberg's opinion that claimant was "not a candidate for viable vocational endeavors, even a simple endeavor of a one or two-step task."

**K. Records dated May 20, 2007 from Oceans Behavioral Hospital.** Claimant was admitted to Oceans on May 24, 2007, with complaints of needing "sleep, peace and quiet." (Tr. 223). She was admitted on a physician's emergency certificate, which stated that she was hearing voices telling her to kill herself. She was angry and uncooperative, and her speech was loud. She admitted to auditory hallucinations and paranoia. Upon cognitive exam, she was able to give the date, month and year. Her social judgment was poor, as was her awareness into her need for treatment. She refused to cooperate with the rest of the cognitive exam.

It was noted that, through individual and group therapy sessions, claimant became more cooperative and interacted well with others. (Tr. 224). Her energy level improved, and she exhibited no sedation. She was no longer psychotic and was able to demonstrate an ability to effectively cope with stressors that increased signs and symptoms of her disorder. She denied hallucinations and delusions.

---

[8] Claimant was taking Risperdol, an anti-psychotic, Effexor, an anti-depressant, and Trazadone for her sleep disturbance. (Tr. 199).

Claimant's condition improved, and she was discharged on May 29, 2007. Her diagnosis was psychosis NOS with a history of chronic paranoid schizophrenia and asthma. (Tr. 225). Her medications were Risperdol 2mg/twice a day, Singular 10mg/twice a day, Klonopin 1mg/twice a day, Vytorin 10-20mg every night, Trazadone 150mg every night, and an Albuterol inhaler as needed four times a day. (Tr. 225). Claimant was scheduled for continuous counseling and medication management at New Iberia Comprehensive Clinic to continue working on her disorder and to ensure medication compliance in a low level of care setting.

## II.     Testimonial Evidence:  ALJ hearing

At the hearing on May 8, 2007, claimant was 41 years old. (Tr. 250). She lived with her son, age 21, and daughter, age 19, in an apartment. (Tr. 250-1). She had a 8th grade education and could read and write "a little bit." (Tr. 252). She testified that she could not make change at a store. She denied ever telling anyone that she managed money. (Tr. 266). She has never paid her rent; her son takes care of the bills. (Tr. 258). She denied drinking or smoking. (Tr. 256).

Her past work included a french fry cook at a fast food restaurant, a sitter for an elderly woman, and a housekeeper. (Tr. 253). She only worked at those jobs for a few months each. She had not looked for work lately. (Tr. 254). She testified that she had a driver's license and used to drive several years ago, but she was in a bad accident, and so her sister took away her license. (Tr. 251-2). When she had a car, her son, then 18 years

old, would pay her insurance and other bills. (Tr. 254).

Regarding complaints, claimant testified that she cannot work because she hears voices all the time and also has daily crying spells and anxiety attacks. (Tr. 254-5, 260, 262). She sometimes sees people and shadows. (Tr. 263). She testified that her medications help her and allow her to sleep. (Tr. 255, 264). She admitted that she ran out of her medication one time. (Tr. 255-6). Claimant goes to an Abbeville clinic regularly for treatment, and her sister drives her there. (Tr. 257). She uses an inhaler for her asthma. (Tr. 262). She has no friends and does not get along with anyone. (Tr. 263). She fusses with her kids.

Regarding activities, claimant testified that she watches television. (Tr. 260). She does not go to the grocery, cook, or fold clothes, but she does try to clean the house. (Tr. 256-7). Her son does the laundry and pays the bills. (Tr. 256, 258). Her sister or children do all the grocery shopping, and she never goes with them. (Tr. 257). She testified that she does not go to church because there are too many people there and they might try to hurt her. (Tr. 259).

Vocational expert ("VE") Lionel Bordelon testified at the hearing. (Tr. 267). He testified that claimant's past job of fast food worker was classified as light, semi-skilled. Her past job of house cleaner was classified as medium, semi-skilled. Her past job of companion sitter was classified as light, low-level semi-skilled.

The ALJ gave the following hypothetical:

*If we had someone of the Claimant's age, education, and work experience, and assume she had no exertional limitations, but because of emotional problems she couldn't do complex work, but she could do work which required that she follow one to two-step instructions. And also, she needed a work environment with no excessive exposure to pulmonary irritants. Could she do any of her prior jobs?*

In response, Mr. Bordelon testified that she could not do the companion sitter job due to the one to two-step instruction limitation. (Tr. 268). He testified that she could not do her previous job of housekeeper due to the possibility of exposure to irritants. He testified that the job of french fry cook at a fast food restaurant might be a possibility, but only if she was not given some other task related to clean up, which would necessarily involve some exposure to irritants. Mr. Bordelon testified that, based on claimant's residual functional capacity, she could perform other jobs of assembler or hand packer, both of which existed in significant numbers in the national economy. (Tr. 269).

The ALJ asked the VE to assume that claimant had emotional problems to the extent that she could not follow even simple one or two-step instructions. In that instance, the VE testified that claimant would not be able to do those jobs or any other jobs available in the national economy. The ALJ then asked the VE to assume that claimant had bipolar disorder or some other episodic disorder which resulted in increased symptomology to the point that she might have to miss four or five days of work per month. The VE stated that she would not be able to do any of the jobs on a sustained basis.

Claimant's attorney asked the VE to assume a number of different scenarios, and to all of which, the VE responded that claimant would not be able to maintain employment. Those scenarios were as follows: person with frequent daily crying spells; person with the general demeanor of rocking back and forth and chewing on fingers; person who tended to deteriorate under stress; person who was seen to be out of touch with reality or respondent to hallucinations; or a person who had conflict with co-workers upon contact. (Tr. 270-1).

## *Analysis*

Claimant argues that the ALJ erred in assessing her residual functional capacity, resulting in a failure to sustain his burden at step 5, erroneously relying upon the testimony of the vocational expert which was given in response to a defective hypothetical question. Because I find that the ALJ decision is not supported by substantial evidence, I recommend that this case be **REVERSED**.

### *Did the ALJ properly weigh the evidence?*

### **1. Appendix 1 Impairments**

Claimant contends that the ALJ erred in concluding that she did not meet or equal Listing 12.04(C), which concerns Affective Disorders, or Listing 12.08, which deals with Personality Disorders.

The ALJ determined that claimant does not satisfy the "paragraph B" criteria of the adult mental disorders Listings in § 12.00 of the Listings of Impairments. In activities of

daily living, the ALJ found that claimant has mild restrictions. She reported to Dr. Buxton that she helps out with chores and simple meals. Her grooming and appearance are good. In social functioning, ALJ found that claimant has moderate difficulties. Dr. Durdin reported that claimant was rude. Dr. Buxton noted that her reasoning was fair and her judgment good. She was alert and responsive. (Tr. 154). With regard to concentration, Dr. Buxton observed claimant to have a slow rate of performance but with good concentration. He opined that she was bright enough to understand and follow simple instructions.

As for episodes of decompensation, claimant was hospitalized on one or possibly two occasions - most recently in May of 2007 for five days.[9] There is no evidence which suggests that claimant has suffered repeated episodes of decompensation or otherwise satisfied § 12.00's listing requirements. Thus, the undersigned concludes that substantial evidence supports ALJ's decision that claimant does not meet the Listings, because her impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation as required by "paragraph B."

## 2. Substantial Evidence

Claimant maintains that substantial evidence does not support the ALJ's conclusion that she can perform sustained gainful employment. Claimant contends, among other things, that the ALJ did not give proper weight to the opinion of Dr. Buxton,

---

[9] Claimant may have been hospitalized at CMHC in July, 2005; the records are unclear as to whether she was an in-patient.

the Social Security Administration's own consultative psychologist.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ultimate issue of disability is reserved to the Commissioner. The ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions accordingly. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez v. Chater*, 64 F.3d 172, 175-176 (5th Cir. 1995), *quoting, Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). A claimant's subjective complaints must be corroborated at least in part by objective medical testimony. *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989).

Claimant contends that the combined effects of depression, bipolar disorder, and side-effects of her medications render her unable to hold a job in a realistic work setting. This conclusion is supported by Dr. Friedberg, who found that claimant would have problems with even a simple endeavor of a one or two-step task. (Tr. 200). Likewise, Dr. Buxton concluded that claimant most likely would not be able to maintain a job due to the combined negative impact of her mental health issues and medications. (Tr. 154). While the ALJ concluded that claimant was not credible because she was very dramatic at the hearing, and also because there were some inconsistences in her testimony,[10] he failed to

---

[10] At the hearing, claimant denied ever having told anyone that she could manage money. (Tr. 266). However, Dr. Buxton reported that she had told him that she shopped and handled money on occasion. (Tr. 153).

address the fact that the reports of both Dr. Friedberg and Dr. Buxton support her allegations of disabling mental impairments, as do the records from several of the mental health clinics at which claimant has been treated.

The ALJ relied upon the opinion of Dr. Durdin, a consultative psychologist, that claimant was a malingerer, even though Dr. Durdin examined claimant in an arguably hostile environment and was not successful in administering a full range of cognitive testing.[11] The ALJ failed to explain his reasons for discounting the final conclusion of Dr. Buxton, who examined claimant at the request of Disability Determination Services. The ALJ has a duty to consider the entire medical record and cannot "pick and choose" only the evidence which supports his position. *See Loza v. Apfel*, 219 F.3d 378 (5th Cir. 2000); *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984).

While he found claimant bright enough to understand simple instructions, Dr. Buxton opined that:

> ". . .she would have difficulty responding in a reliable and dependable fashion as an employee secondary to the negative impact of the schizoaffective disorder and the characterological defects on her functional capabilities. She would likely not respond well to the frustration and stress that she would encounter in the job setting and would perform in a fashion that would lead to her own demise. This was apparently what happened with claimant's previous attempts at employment. While she may be able to establish relationships, she would have some difficulty maintaining mutually rewarding relationships with co-workers and supervisors." (Tr. 154).

The ALJ cited some of Dr. Buxton's findings while ignoring his ultimate

---

[11] Dr. Durdin stated that claimant had missed her previous appointment and came at the wrong time for the consultative exam. Claimant offered evidence which showed that she had called the Social Security office to change her initial appointment because of Hurricane Rita. These misunderstandings apparently created a contentious atmosphere during the actual exam, and claimant was admittedly uncooperative. *See* Rec. Doc. 9, p. 6.

conclusion that "[i]f, and when, [claimant] should demonstrate significant improvement in her overall functional status, . . . then an attempt at gainful competitive employment would be appropriate." Implicit in this observation is the physician's opinion that claimant is not fit for work.

Dr. Friedberg also found claimant to be "very fragile" and "not a candidate for even a simple endeavor of one or two-step task[s]." (Tr. 200). At CMHC, claimant was diagnosed with bipolar disorder, post-traumatic stress disorder and mild mental retardation. At the Abbeville health center, she was diagnosed with major depression and anxiety disorder. At Oceans, she was diagnosed with psychosis NOS with a history of paranoid schizophrenia. Thus, Dr. Durdin's opinion is inconsistent with the majority of the medical evidence in the record, and, as such, is not entitled to significant weight. The opinions of Dr. Buxton, who was retained by the Social Security Administration, and Dr. Friedberg, simply do not indicate that claimant is capable of working on a sustained basis at this time.

The overwhelming evidence of record shows that claimant's impairments are chronic and severe. Claimant has apparently been suffering from these impairments for several years. There are no reports from any examining physician which contradict or dispute the opinions of Drs. Buxton and Friedberg that claimant's mental problems preclude her from maintaining employment due to unreliability secondary to her mental impairments. The social worker at CMHC also opined that claimant would be unable to

maintain a job with her mental problems.  (Tr. 151).

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that claimant can find employment and that she can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time.  *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (*citing Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as keeping a job in a *realistic* work setting. *Watson*, 288 F.3d at 217.  In *Wingo v. Bowen*,[12] the Court held that:

> a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831.  We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world."  *Id.* (*citing Allred v. Heckler*, 729 F.2d 529, 533 (8th Cir.1984)).

Dr. Buxton opined that claimant would likely have insurmountable difficulties in dealing with occupational stressors.  Dr. Friedberg's opinion of claimant was that she is "very fragile."  Further, the vocational expert testified that employers would not tolerate an employee's absences from work.  (Tr. 270).  Considering the foregoing, the undersigned finds that the ALJ's determination that claimant could perform work on a

---

[12] *Wingo,* 852 F.2d 827 (5th Cir. 1988).

sustained basis is not supported by substantial evidence.

*Conclusion*

For the foregoing reasons, it is **RECOMMENDED** that the Commissioner's decision be **REVERSED** and that benefits be awarded consistent with an onset date of May 24, 2005.[13]

Under the provisions of 28 U.S.C. Section 636(b)(1)(c) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See Douglass v. United Services Automobile Association*, 79

---

[13] A judgment entered adopting this Report and Recommendation constitutes a "final judgment" that triggers the filing period for an EAJA fee application. *Shalala v. Schaeffer*, 509 U.S. 292, 113 S.Ct. 2625, 2631 (1993); *Freeman v. Shalala*, 2 F.3d 552 (5th Cir. 1993).

**F.3d 1415 (5ᵗʰ Cir. 1996).**

    Signed at Lafayette, Louisiana, on September 4, 2009.


_____

_____

                                      *C. Michael Hill*
                                      C. MICHAEL HILL
                                      UNITED STATES MAGISTRATE JUDGE